Randy J. JONES and
Elizabeth M. Jones

v.

MILES LABORATORIES, INC.,
Individually and d/b/a Cutter
Laboratories.

Civ. No. 1:86–cv–83–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 5, 1988.

George H. Connell, Jr., Atlanta, Ga., for plaintiff(s).

Duncan Barr, O'Connor, Cohn, Dillon & Barr, San Francisco, Cal., A. Timothy Jones, Stephen M. Lore, Freeman & Hawkins, Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This diversity suit for damages is before the court on Defendant's motion for judgment notwithstanding the verdict. After considering the briefs filed by the parties, Defendant's motion is granted.

The Plaintiff Randy J. Jones is a hemophiliac who suffers from acquired immune deficiency syndrome ("AIDS"). Elizabeth M. Jones is his wife. In the fall of 1983, Mr. Jones purchased a blood clotting product from the Defendant; he contends the product contained HIV virus which was responsible for his contracting AIDS. He contends Defendant was negligent in manufacturing the product.[1] The jury awarded Mr. Jones $150,000 in medical expenses, $200,000 for pain and suffering, and $750,000 for lost earnings. The jury awarded

---

1. Plaintiffs' strict liability and breach of warranty claims were previously rejected in an order granting partial summary judgment for Defendant.

Mrs. Jones $500,000 for her loss of consortium claim.

The pertinent facts, none of which are disputed, are as follows:

The Defendant Cutter Laboratories ("Cutter") at relevant times was one of four manufacturers of a product called Factor VIII within the United States. Cutter's Factor VIII product is called Koate; it is a highly concentrated blood clotting product which is manufactured using human plasma as its basic element. The plasma donations of thousands of persons are combined and distilled to produce a lot of Koate. Each lot of Koate is divided and sold in small vials, with there being three to five thousand vials per lot.

The plasma donations allegedly at issue were given by a paid donor named Christopher Whitfield at a plasmapheresis center, Austin Blood Components, Inc. in Austin, Texas. Austin Blood Components then sold Whitfield's plasma to Cutter, which used it to make Koate.

On October 21, 1983, Christopher Whitfield died of AIDS. Just before he died, he told his treating physician that he was a homosexual. As Mr. Whitfield was the first known AIDS victim in Austin, the local newspaper carried an article about the fact that he had died of AIDS. The Director of Austin Blood Components, Inc. read the article. She checked Austin Blood Components' records and learned that Whitfield had been a plasma donor both in 1982 and 1983 on many occasions. Other evidence at trial reflected that Whitfield had also donated many times during 1982–1983 at Austin Plasma Center, another plasmapheresis center in Austin.

Austin Blood Components contacted Cutter and revealed what they had learned. Through Austin's and Cutter's records, Cutter was able to determine what lots of Koate had contained Mr. Whitfield's plasma. Cutter sent a letter to all hospitals and doctors who had purchased Koate in the time frame affected by Mr. Whitfield's donations, recalling all bottles of Koate within the lot numbers which had been made using Mr. Whitfield's plasma. The letter identified the lots by number, and specifically stated that they contained plasma obtained from an individual who had AIDS.

Clayton General Hospital in Atlanta, Georgia, received Cutter's recall letter. The hospital identified Plaintiff Randy Jones as a patient who might have received Koate from one of the recalled lots. Specifically Jones' hospital file reflected that while he had been a patient at Clayton General in September, 1983, the hospital had ordered Koate for him;[2] the Koate which had been ordered consisted of numerous vials within lots 8450, 8460, and 8476. Two of the lots, 8460 and 8476, were subjects of Cutter's recall letter. Clayton General notified Randy Jones' physician of this development.

Clayton General Hospital checked and determined that none of the vials of Koate within Lot No. 8460 which had been ordered for Mr. Jones had been used; they were still on the hospital pharmacy shelf. They were returned to Cutter. Most of the vials marked with Lot No. 8476 remained on the pharmacy shelf; they were sent back to Cutter. The hospital records indicate that several vials of Lot No. 8476 were mixed with sterile water and sent to the nursing station for intended infusion into Mr. Jones. However, Jones' hospital chart identifies only vials from Lot No. 8450 as having been administered to him. One entry on the hospital chart reflects administration of three vials of Koate from an unidentified lot number, but the number of units administered at that time (2010), is more consistent with its being in Lot No. 8450 (670 units per vial, whereas the vials from Lot No. 8476 each contained 290 units). Mr. Jones was billed for Koate from Lot Nos. 8450 and 8476.[3]

2. The hospital's practice was to purchase the clotting factor on an "as needed" basis. Mr. Jones had been hospitalized due to uncontrolled bleeding following some surgery.

3. The evidence also showed that Mr. Jones received Factor VIII during the October, 1983 admission which had been purchased from the American Red Cross. There was no specific evidence concerning contamination of that

In November, 1983, Randy Jones was admitted to Clayton General Hospital again, this time in connection with a severe virus-like illness. Dr. Carlos Osmon, a hematologist, testified that there is now evidence that this type of episode often follows the initial exposure to the HIV virus by four to six weeks, and represents the first assault of the virus on the body's immune system.

After recovering from the virus-like episode in the fall of 1983, Randy Jones' general health was good until 1986, when he began experiencing various symptoms known to be associated with a full blown case of AIDS. Mr. Jones, who worked for a contracting firm, was able to continue working until the fall of 1987. Since that time, he has been unemployed and has experienced significant physical discomfort and limitation in his daily activities. The fact that Mr. Jones has AIDS is not disputed.

According to Richard Riojas, Director of Austin Plasma Center, it was routine practice in the plasma industry in Texas in 1982 and 1983 to inquire of a donor whether he was a homosexual and to require him to verify in writing that he was not. Mr. Riojas testified that he could not recall when his center started that procedure, but he believed it was in December of 1982 after FDA recommendations or regulations had come out regarding the necessity to screen out high risk donors, including homosexuals. However, Riojas did not have a copy of the FDA recommendation or regulation at the time of the deposition; he stated he would send it later to Plaintiffs' counsel. At trial, Plaintiffs did not introduce into evidence or identify any FDA regulation or recommendation to show what Riojas had been referring to.

The evidence was undisputed that in 1982, little was known in the scientific and medical community about AIDS. It was known that the disease particularly victimizes homosexual men, but it was not known

how the disease was transmitted. As of the end of 1982, eight hemophiliacs nationwide had been identified as having AIDS. Over the course of 1983, there was a growing fear and suspicion that AIDS might be transmissible through human blood, but there was no proof that this was so. There was no way in 1982 or 1983 to test an individual or to test his blood to see if he was a carrier of AIDS.

The evidence fails to reflect that the Food and Drug Administration or any other governmental agency issued any regulations in 1982 or 1983 requiring plasmapheresis centers to ask donors if they were homosexuals.[4] However, the evidence does show that on March 24, 1983, the FDA sent out a letter to all plasmapheresis centers recommending that certain measures be taken to screen out donors at high risk for AIDS, including homosexuals. These measures including giving information to prospective donors concerning the need for persons in high risk groups to exclude themselves from plasma donation programs, and inquiry concerning physical signs of AIDS, including unexplained weight loss, lymph node enlargement, night sweats, or unexplained fevers.

Christopher Whitfield made many plasma donations at both Austin Blood Components, Inc. and Austin Plasma Center during 1982 and 1983. At both centers, certain screening procedures were employed each time. His weight was recorded, his blood pressure and pulse were taken, his temperature was taken, and his blood was tested for red blood cell count. Also, urinalysis was done to see if protein appeared in his urine; this is a possible indication of kidney malfunction or perhaps simple dehydration. Whitfield's records at both Austin Plasma Center and Austin Blood Components, Inc. do not reflect that he was asked questions at either center during 1982 regarding whether he was a homosexual. His last visit to Austin Plasma Center in

factor, but there was undisputed evidence that HIV contamination of Factor VIII produced in that time frame was so widespread that it is reasonably likely that the Red Cross factor also contained the virus.

4. Neither have counsel pointed out any published regulation on this subject.

1982 was on November 22, 1982; at that time he was not allowed to donate plasma because his urine tested positive for protein. Whitfield's next visit to Austin Plasma Center was on February 4, 1983; he was rejected on that date as well due to protein in his urine. However, subsequent to that date, Whitfield gave plasma at Austin Plasma Center many times in 1983.

On January 31, 1983, Mr. Whitfield made a plasma donation at Austin Blood Components, Inc.; this is one of the donations which was used in Koate Lot No. 8476 and which Plaintiff Randy Jones claims caused him to contract AIDS. At that visit, Mr. Whitfield received the normal health checks, but was not asked whether he was a homosexual. Similarly, on February 3, 1983, Mr. Whitfield made another donation which was utilized in Koate Lot No. 8476, but was not asked whether he was a homosexual. However, Austin Blood Components, Inc.'s records reflect that beginning February 28, every other time Mr. Whitfield donated plasma in 1983, he was asked whether he was a homosexual; he responded negatively every time. Also, Mr. Whitfield was asked to sign a form at Austin Blood Components, Inc. on March 3, 1983, and again on August 8, 1983, verifying that he was not a homosexual; he signed both of these forms in the presence of a witness who signed also. These forms stated that the reason the verification was being sought was because of concern that a homosexual would be more likely to be an AIDS carrier.

The Defendant submitted evidence showing that in the opinion of persons knowledgeable about hemophilia and blood products, there was widespread HIV contamination of blood products made in 1982 and 1983. At this point, the vast majority of severe hemophiliacs in the United States are carriers of the AIDS virus, presumably due to dependence on blood products such as Koate. Plaintiff offered no evidence to dispute this.

The Defendant makes a number of arguments in support of its motion for judgment notwithstanding the verdict. It argues that there is no credible proof of negligence and further that proof of causation is missing. With respect to causation, Defendant argues that there is no reasonable basis for a supposition that if Mr. Whitfield had been asked on January 31 and February 3, 1983 whether he was a homosexual, that he would have responded affirmatively. Defendant argues that the record contains insufficient proof that Mr. Jones actually was infused with Factor VIII from Koate Lot No. 8476 which contained Mr. Whitfield's plasma. Finally, Defendant argues that there is insufficient evidence that Koate from Lot No. 8476 caused Mr. Jones to develop AIDS, even if he received Factor VIII from that lot, because Mr. Jones had received blood factor from other manufacturers or suppliers which also was likely contaminated with the AIDS virus. Finally, Defendant argues that there was insufficient evidence that Austin Blood Components, Inc. was an agent of Defendant Cutter so as to make Cutter liable for Austin's negligence, if any.

■ The court rejects Defendant's argument that the evidence was insufficient to show that Austin Blood Components, Inc. was the agent of Cutter. The evidence showed that although Austin Blood Components, Inc. is an independently owned company, it sells 99% of its plasma to Cutter. It follows the plasma collection procedures required by Cutter. During a period of time in 1983, the two companies operated without the benefit of a written contract. This evidence is sufficient for the jury to find that Defendant Cutter had the power to control and actually exercised control over the plasma collection procedures utilized by Austin Blood Components, Inc.

The court finds, however, that the evidence was insufficient to establish negligence; further, the record plainly supports two of the three causation arguments made by Cutter. Accordingly, the court has the duty to grant Defendant's motion for judgment notwithstanding the verdict and will do so.

■ The only claim of negligence submitted to the jury was Plaintiffs' claim that Austin Blood Components, Inc. was negli-

gent in failing to inquire of Mr. Whitfield when he made donations on January 31 and February 3, 1983 whether Whitfield was a homosexual. Negligence, of course, is the absence of ordinary or reasonable care; ordinary care is that degree of care which reasonably prudent persons exercise. In the context of the plasmapheresis industry, the standard would be that employed by a reasonably prudent plasmapheresis center.

The only evidence submitted by Plaintiffs on the issue of negligence was the testimony of Richard Riojas. Riojas did assert that it was routine practice for plasmapheresis centers in Texas in 1982 and 1983 to make inquiries to screen out high risk donors, including homosexuals, but he then stated that this practice had not been begun until the FDA had issued a regulation or a recommendation, which he believed was in December 1982. There was no evidence of any such recommendation or regulation being issued in 1982; rather, the only evidence was that the FDA issued a written recommendation on March 24, 1983. That the FDA recommendation of March 24, 1983 was the first written recommendation from the FDA is supported by other documentary evidence in the case, specifically, an internal Cutter document written in February, 1983 noting that the FDA had not yet taken any action but that it might do so in the future. Therefore, since Cutter initiated its high risk donor screening program on February 22, 1983, it actually began these procedures before the FDA recommended them and perhaps before Austin Plasma Center initiated its screening program. Therefore, the evidence strongly suggests that Mr. Riojas was mistaken as to his time frame.

Furthermore, the Defendant introduced extensive evidence, none of which was specifically disputed by any of the Plaintiffs' witnesses, showing that practically nothing was known in 1982 and 1983 concerning the way in which AIDS is transmitted. The evidence did show that there was growing suspicion throughout 1983 that AIDS might be transmissible through blood products, but even then there was no medical consensus that this was the case. These witnesses included not only persons affiliated with Cutter, but also independent medical experts affiliated with the National Hemophilia Foundation. Hence, there was no credible evidence of negligence on the Defendant's part.

■ The court chooses not to address Defendant's argument that there is insufficient evidence that Mr. Jones was infused with Koate from Lot No. 8476. However, it finds that the evidence negatives causation with respect to Plaintiffs' theory that if Christopher Whitfield had been asked in January and February of 1983 whether he was a homosexual, he might have responded affirmatively and been excluded as a donor. The jury simply could not have reasonably adopted Plaintiffs' theory, as the record plainly shows that on at least 25 occasions in 1983, Whitfield was asked that very question and responded negatively. Furthermore, on March 3, 1983—a few weeks after the second donation which was used in Lot No. 8476—Whitfield verified in a signed, witnessed document that he was not a homosexual. Thus, there is not only no reason to assume that he would have responded truthfully on the relevant dates in January and February; there is every reason to believe that he would not have.

■ Finally, Plaintiffs have not addressed either through evidence or argument the Defendant's contention that the record does not support a finding that Mr. Jones likely got his AIDS from Koate Lot No. 8476, when he could just have well gotten it from other blood factor, primarily the blood factor supplied by the American Red Cross during the same hospital admission. The undisputed evidence is that it is now known that blood factor products made during the 1982–1983 time frame were widely contaminated with the AIDS virus, to such a degree that most severe hemophiliacs are now carriers. Given this state of the record, it would not have been proper for the jury to conclude that Whitfield's plasma was likely the cause of Mr. Jones' AIDS.

■ Although the court grants the Defendant's motion for judgment notwithstanding the verdict, pursuant to Rule

50(c), Fed.R.Civ.P., the court will also conditionally rule on Defendant's motion for a new trial. In support of this motion, Defendant argues that the damages awarded by the jury are speculative, not in accordance with the evidence, and contrary to the instructions of the court. The court agrees that the damages awarded are inconsistent with the evidence and the court's instructions.

The court specifically charged the jury that Mr. Jones' wage claim was limited to earnings he would lose during his life time due to his incapacitating illness. While the evidence certainly recognized that medical research on AIDS is ongoing and one may hope for a cure or improved treatment at any time, under the current state of medical knowledge, Mr. Jones' life expectancy is very short. He has been out of work since the fall of 1987 and was earning about $30,000 a year before he had to quit. Obviously, the jury determined that it would treat this case as a wrongful death case; in doing so, it disregarded the court's instructions. The failure to follow the court's instructions with respect to the lost wage claim also suggests a similar problem with respect to the loss of consortium claim. While the court understands fully and shares the jury's great sympathy for the Jones' plight, it is the court's responsibility to disallow a verdict which has no basis in law or fact. Accordingly, the court conditionally determines that if the judgment in Defendant's favor is reversed on appeal, a new trial shall be granted.

In summary, the Defendant's motion for judgment notwithstanding the verdict is GRANTED. Defendant's request for a hearing on the motion is DENIED.