John C. GIBSON, Linda G. Preston, Individually and as Executrix of the Estate of Catherine V. Gibson, Deceased, John G. Gibson, Jr., and Barbara Lancton, Appellants,

v.

The METHODIST HOSPITAL and the Methodist Health Care Network, Inc., Appellees.

No. 01–89–00645–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 17, 1991.

Rehearing Denied Dec. 19, 1991.

Michael Y. Saunders, John W. Tavorina, Houston, for appellants.

Barbara Radnofsky, Brenda T. Strama, Houston, for appellees.

Before DUGGAN and MIRABAL, JJ.

## OPINION ON MOTION
## FOR REHEARING

DUGGAN, Justice.

This is an appeal from a summary judgment granted in favor of appellees, The Methodist Hospital ("Methodist") and the Methodist Health Care Network ("Network"). On motion for rehearing, we grant the motion, withdraw our original opinion of January 31, 1991, and substitute the following opinion, affirming the judgment of the trial court.

Appellants sued Gulf Coast Regional Blood Center ("Gulf Coast"), Methodist, Network, and John Overstreet, M.D., pursuant to the Texas Wrongful Death Act, TEX.CIV.PRAC. & REM.CODE ANN. § 71.002 (Vernon 1986), and Survival Statute, TEX. CIV.PRAC. & REM.CODE ANN. § 71.021 (Vernon 1986), alleging that Catherine V. Gibson, deceased, contracted Acquired Immune Deficiency Syndrome ("AIDS") as a result of receiving a blood transfusion while hospitalized at Methodist. Gibson underwent surgery for colon cancer at Methodist on February 28, 1983. Following surgery, Gibson's attending physician, Dr. Overstreet, ordered from Methodist two units of blood, which were transfused into Gibson on March 8, 1983. Gulf Coast collected the blood on February 26 and 27, 1983, and supplied the units to Methodist.

Gibson died of AIDS-related complications on May 4, 1987.

Appellants allege negligence, breach of express and implied warranties, and other legal duties owed by Methodist and Network to Gibson, and strict liability in tort. The trial court granted summary judgment in favor of Methodist and Network, and this appeal followed.

■ A defendant who moves for summary judgment must show, as a matter of law, that no material issue of fact exists in the plaintiff's cause of action. *Griffin v. Rowden*, 654 S.W.2d 435, 435–36 (Tex. 1983). This may be accomplished by showing that at least one element of the plaintiff's cause of action has been established conclusively against the plaintiff. *Nicholson v. Naficy*, 747 S.W.2d 3, 4 (Tex.App.—Houston [1st Dist.] 1987, no writ). Summary judgment for the defendant is proper only if, as a matter of law, the plaintiff cannot succeed on any theories pleaded. *Delgado v. Burns*, 656 S.W.2d 428, 429 (Tex.1983); *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970).

■ The question on appeal, as well in the trial court, is not whether the summary judgment proof raised fact issues on the essential elements of the cause of action, but whether the summary judgment proof establishes as a matter of law that no issue of material fact exists on one or more essential elements of the cause of action. *Gibbs*, 450 S.W.2d at 828. Evidence favorable to the non-movants must be taken as true; every reasonable inference must be indulged in favor of the non-movants; and any doubts must be resolved in favor of the non-movants. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

■ The four essential elements of a medical negligence cause of action are: (1) a legally cognizable duty requiring conformity to a certain standard of conduct; (2) a failure to conform to the required standard; (3) actual injury; and (4) a reasonably close causal connection between the conduct and the alleged harm. *Tilotta v. Goodall*, 752 S.W.2d 160, 161 (Tex.

App.—Houston [1st Dist.] 1988, writ denied); *Nicholson*, 747 S.W.2d at 3; *Price v. Hurt*, 711 S.W.2d 84, 86 (Tex.App.—Dallas 1986, no writ); *Cloys v. Turbin*, 608 S.W.2d 697, 700 (Tex.Civ.App.—Dallas 1980, no writ). In determining issues of medical negligence, the trier of fact must be guided solely by the opinion testimony of a qualified expert witness. *Hart v. VanZandt*, 399 S.W.2d 791, 792 (Tex.1965); *Wheeler v. Aldama–Luebbert*, 707 S.W.2d 213 (Tex.App.—Houston [1st Dist.] 1986, no writ). Such testimony must be clear, positive, direct, otherwise credible, and free from contradictions and inconsistencies, and capable of being readily controverted. *Republic Nat'l Leasing Corp. v. Schindler*, 717 S.W.2d 606, 607 (Tex.1986); TEX. R.CIV.P. 166a(c).

Administration of "Inappropriate" Blood

■ Appellants' first point of error maintains that the trial court granted summary judgment notwithstanding material fact questions regarding Methodist's purported negligence in transfusing inappropriate blood to Gibson. Appellants allege that (1) Methodist personnel negligently transfused the wrong type of blood to the deceased, and (2) Methodist deviated from the standard of care when it unilaterally changed Dr. Overstreet's order for whole blood and, instead, administered packed red blood cells.

Appellees offered competent summary judgment proof in the form of the affidavit and the deposition testimony of David Yawn, M.D., medical director of the Methodist transfusion service and Methodist's blood bank. Dr. Yawn addressed the question of whether Methodist deviated from the standard of care by transfusing packed red blood cells into Gibson, rather than whole blood, as ordered by Dr. Overstreet.

In his affidavit, Dr. Yawn stated that he was familiar with the standard of care for transfusion of blood and blood components for hospitals in 1983 and proceeded to set forth the applicable standard. In his deposition testimony, Dr. Yawn noted that the administration of whole blood was not standard practice for hospitals at this time. He

explained that even if a physician ordered whole blood for transfusion of a patient, the administration of packed blood cells was a good, safe, and improved way of filling an order for whole blood.

Appellees also offered the affidavit of John Overstreet, M.D., Gibson's attending physician who ordered the units of whole blood. Dr. Overstreet concluded that "the effect would be the same whether you gave a unit of whole blood or whether you give a unit of packed cells." He said he had no complaint about the way Methodist handled the matter.

Appellants did not offer summary judgment evidence to controvert Dr. Yawn's or Dr. Overstreet's testimony about the lack of deviation from the standard of care or negligence regarding the kind of blood that was transfused to Gibson. Thus, the uncontroverted summary judgment evidence establishes, as a matter of law, that Methodist's conduct in transfusing the packed red blood cells met the standard of care for hospitals in 1983 and did not constitute negligence. Point of error one is overruled.

### Screening of Blood Donors

■ In their second point of error, plaintiffs allege that the trial court erroneously granted the summary judgment because there are material issues of fact regarding Methodist's negligence in (1) not adopting or following recommendations of the American Association of Blood Banks and (2) not using available surrogate testing to determine if the blood package was contaminated. In support of their position, appellants offered the affidavit of Michael Kramer, Ph.D., an epidemiologist with a masters degree in public health.

Dr. Kramer stated in his affidavit that on January 13, 1983, the American Red Cross, the Council of Community Blood Centers, the American Blood Commission, the American Blood Resources Association, the Centers for Disease Control, the Food and Drug Administration, the National Hemophilia Foundation, and the National Gay Task Force issued a *Joint Statement on Acquired Immune Deficiency Syndrome*

*Related to Transfusions* [hereinafter cited as *"Joint Statement"*]. He maintains that these recommendations were received and, therefore, were known to Methodist at the time it transfused the blood to Gibson.

The *Joint Statement* included a number of recommendations regarding blood transfusions, including a recommendation that specific questions be asked at the time of donor screening "to detect possible AIDS or exposures to patients with AIDS in particular." Appellants assert that neither Gulf Coast nor Methodist made any of the recommended changes in screening procedures before February 26 and 27, 1983, the dates the contaminated blood was collected by Gulf Coast. The uncontroverted summary judgment evidence shows, however, that the blood transfused into Gibson was obtained from Gulf Coast, which is not a party to this appeal. Thus, appellants' arguments pertaining to improper donor screening are inapplicable to Methodist.

### Surrogate Testing of Blood

■ Appellants also contend that Methodist should have employed the Hepititis B Core Antibody Test ("surrogate test") to screen blood or should have demanded that Gulf Coast employ the surrogate test for blood supplied to Methodist. Appellees offered competent summary judgment evidence that the standard of care for hospitals in 1983 regarding blood transfusions did not involve screening of donors or testing of blood. In his affidavit, Dr. Yawn stated that he was familiar with the standard of care used by blood banks and hospitals in 1983 in the community for the testing of blood or blood components. He noted that in March of 1983, no test was available for the AIDS virus, as the scientific community had not concluded that AIDS was transmitted through blood. Dr. Yawn further stated that, in April of 1984, scientists identified the human immunodeficiency virus as the causative agent of AIDS and that a test was not licensed by the Food and Drug Administration to screen for antibodies to the AIDS virus until March of 1985.

Appellee's summary judgment evidence demonstrates that, as of 1983, no pharmaceutical company, blood bank, hospital, or federal health care regulator in the United States took special AIDS-related measures in connection with transfusions. Appellants did not controvert this. Further, appellants do not identify any organization, government entity, or medical association that advocated (let alone required) surrogate testing as a means of screening donated blood for AIDS in 1983. Appellants have not identified a single hospital that used such measures. Instead, appellants offer the affidavit of an expert who contends, in *hindsight*, that Methodist should have used surrogate testing.

Appellants rely on Dr. Kramer's affidavit that Methodist did not use surrogate testing and that screening and testing of blood that pertained to the transfusions given to Gibson "fell below the standard of care for Houston, Texas" for 1983. Dr. Kramer concluded that if surrogate tests had been performed on the donated blood, "Mrs. Gibson, with reasonable probability would not have received the infected blood which caused her to contract AIDS."

■■■ Dr. Kramer failed to set out the standard of care for a hospital regarding blood transfusions given to patients in 1983. *See Beal v. Hamilton,* 712 S.W.2d 873, 876 (Tex.App.—Houston [1st Dist.] 1986, no writ). In a medical malpractice suit, the standard of care is the threshold question that must be established before the factfinder can determine whether the acts of the health care provider deviated from the standard of care to the point of negligence or malpractice. The standard of care for professional medical services is the duty to exercise that degree of care that a practitioner of ordinary prudence and skill practicing in the community or a similar community would have exercised in the same or similar circumstances. *Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977); *Beal,* 712 S.W.2d at 876.

■■■ Speculative and conclusional statements are inadequate to defeat competent summary judgment evidence. *See Trevino v. Houston Orthopedic Center,* 782 S.W.2d

515 (Tex.App.—Houston [14th Dist.] 1989, no writ); *LaFleur v. Astrodome–Astrohall Stadium Corp.,* 751 S.W.2d 563, 566 (Tex. App.—Houston [1st Dist.] 1988, no writ); *Coan v. Winters,* 646 S.W.2d 655 (Tex. App.—Fort Worth 1983, writ ref'd n.r.e.). Thus, Dr. Kramer's statements do not raise a fact issue as to whether the standard of care required that Methodist either perform the surrogate test on blood received from Gulf Coast or demand that Gulf Coast perform surrogate testing. *See Nicholson,* 747 S.W.2d at 5.

We hold that summary judgment on these issues was proper. Appellants' second point of error is overruled.

### Informed Consent

■■■ In point of error three, appellants contend that the trial court erred in granting summary judgment because Methodist failed to obtain informed consent from Gibson. They assert that Methodist did not inform Gibson of (1) the risks associated with AIDS, (2) the possibility of autologous donations (pre-need donation of one's own blood), or (3) the possibility of receiving designated donations from a known, safe donor. Appellants, however, offered no expert testimony on their informed consent issues.

■■■ In Texas, physicians and health care providers are liable for negligent failure to disclose the risk involved in the medical care if the risk or hazard could have influenced a reasonable person in making a decision to give or withhold consent. *Peterson v. Shields,* 652 S.W.2d 929 (Tex.1983); *Wilson v. Scott,* 412 S.W.2d 299, 301 (Tex.1967); TEX.REV.CIV.STAT.ANN. art. 4590i, §§ 6.02, 6.05 (Vernon Supp. 1991). To deny the defendant's motion for summary judgment on informed consent, an issue of fact must be present as to (1) whether the undisclosed risk was inherent to the medical procedure or (2) whether the undisclosed risk was material enough to influence a reasonable person to withhold consent to the procedure. *Barclay v. Campbell,* 704 S.W.2d 8, 9–10 (Tex.1986). In addition, Texas courts require that a

party urging lack of informed consent show that the damages alleged were proximately caused by the failure to obtain informed consent. *McKinley v. Stripling*, 763 S.W.2d 407, 410 (Tex.1989).

The summary judgment evidence shows that, in February 1983, AIDS was not a known inherent or material risk associated with the transfusion of blood. Appellants' allegation that Methodist failed to obtain informed consent despite all the "knowledge and recommendations" has no support in the record. Dr. Yawn testified that AIDS was not known to be a material risk of a blood transfusion in 1983 when Gibson received her transfusion.

Dr. Yawn stated in his affidavit that he did not conclude there was a risk of contracting AIDS through a blood transfusion until late 1984 or early 1985. According to Dr. Yawn, this type of risk was not disclosed to Gibson, or any other patient in 1983. Moreover, Dr. Overstreet, Gibson's attending physician, testified, by way of deposition, that he had the duty to obtain informed consent; that he warned Gibson of the material risks of a blood transfusion known at the time, including with particularity the danger of hepatitis; that Gibson gave informed consent; and that a reasonable patient under the circumstances at the time would have consented to a transfusion "without question." Dr. Overstreet agreed that it was his duty to obtain informed consent and discuss the risks, and that he did so in this instance. This testimony is uncontroverted by appellants.

■ It is not the function of a hospital to discuss with a patient risks and benefits of a procedure; this duty lies with the physician. *See Ritter v. Delaney*, 790 S.W.2d 29, 31 (Tex.App.—San Antonio 1990, writ denied); *Nevauex v. Park Place Hosp., Inc.*, 656 S.W.2d 923, 925 (Tex. App.—Beaumont 1983, writ ref'd n.r.e.) (the duty to obtain informed consent in Texas is that of the physician); *Weiser v. Hampton*, 445 S.W.2d 224, 231 (Tex.Civ. App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.). Thus, Methodist did not have a duty to obtain informed consent from Gibson.

Appellants claim that the 1989 edition of the Methodist transfusion consent form, which was rewritten in response to the 1989 recommendations of the Texas Medical Disclosure Panel, is evidence of a duty in 1983 to obtain informed consent. No evidence supports this assertion.

Appellants also assert that the *Joint Statement* suggested that autologous blood transfusions be considered more frequently, especially in cases of elective surgery. A determination about whether a patient qualifies for autologous blood transfusions is a medical decision. Appellants offered no expert testimony to the effect that Gibson could have qualified for autologous donation or that Methodist had a duty to inform Gibson of this type of donation.

Appellants' third point of error is overruled.

■ In points of error four and five, appellants allege that the trial court erred in granting summary judgment in that it failed to follow the rationale of the Corpus Christi Court of Appeals in the case of *Longoria v. McAllen Methodist Hosp.*, 771 S.W.2d 663 (Tex.App.—Corpus Christi 1989, writ denied). In *Longoria*, the court stated:

> Appellees' summary judgment evidence addresses the question of screening blood or donors for AIDS and includes affiants' conclusions that appellees were not negligent. However, Kramer's affidavit raises the issue of whether the hospital or blood service should have screened the donors or the blood for *other diseases* and whether such screening would have prevented the child's infection and death. We conclude that appellees failed to establish that they were not negligent as a matter of law.

*Id.* at 665 (emphasis added).

*Longoria* involved a blood transfusion given to a child shortly after her birth in 1982. The trial court granted defendants' motion for summary judgment, based on affidavits showing that testing for AIDS in blood donations was not performed in 1982. It is important to note that the plaintiffs

filed a limited appeal, claiming that the summary judgment evidence failed to establish, as a matter of law, that defendants were not liable for the child's contracting of cytomegalovirus ("CMV") and that had defendants properly screened blood donors, the child's death may have been prevented. The court of appeals agreed that a fact issue was created as to whether the blood should have been screened for CMV. *Id.*

We do not interpret *Longoria* to mean that "surrogate" testing should have been performed to detect AIDS in February of 1983, or that donor screening procedures recommended by one expert should have been the standard of care regardless of the standards and regulations of the accrediting and licensing bodies dictated to the heavily regulated blood banking industry. A number of courts have considered the same issue and held that "surrogate" testing was not the standard for the blood banking industry prior to 1985. *See, e.g., Kirkendall v. Harbor Ins. Co.,* 698 F.Supp. 768, 774–75 (W.D.Ark.1988), *aff'd,* 887 F.2d 857 (8th Cir.1989); *McKee v. Miles Laboratories, Inc.,* 675 F.Supp. 1060, 1064 (E.D.Ky.1987), *aff'd,* 866 F.2d 219 (6th Cir. 1989); *Kozup v. Georgetown Univ.,* 663 F.Supp. 1048, 1057 (D.D.C.1987), *aff'd* 851 F.2d 437 (D.C.Cir.1988); *see also Jones v. Miles Laboratories, Inc.,* 700 F.Supp. 1127, 1132 (N.D.Ga.1988), *aff'd,* 887 F.2d 1576 (11th Cir.1989).

Appellants' fourth and fifth points of error are overruled.

### Warranty and Products Liability

■ In their sixth and final point of error, appellants allege that the trial court erred in granting summary judgment on the issues of strict liability and breach of warranty. They assert that (1) they stated causes of action for strict liability and breach of warranty, and (2) Methodist at least had a duty to warn Gibson's physician, or Gibson herself, about the risk of contracting AIDS by way of a transfusion. Appellants' theories rest on the assumption that blood is a product, and Gulf Coast's provision of blood to Methodist was the sale of a product.

Texas law clearly provides that Methodist cannot be held liable on the issues of strict liability and implied warranty. To encourage and protect the availability of the volunteer blood supply, two Texas statutes, commonly referred to as "blood shield statutes," limit the legal liability of persons and organizations engaged in these services. Tex.Civ.Prac. & Rem.Code Ann. §§ 77.-001–77.004 (Vernon 1986 & Supp.1991); Tex.Bus. & Com.Code Ann. § 2.316 (Tex. UCC) (Vernon 1968). Under these statutes, qualified blood banks, persons, and organizations involved in services pertaining to the acquisition and transfusion of blood from one person to another are liable only for negligence, gross negligence, or an intentional tort. Further, section 77.003 expressly states that implied warranties of merchantability and fitness do not apply to the furnishing of human body parts, defined in section 77.001 to include blood, by blood banks, tissue banks, or other similar organizations.

■ The Texas Uniform Commercial Code provides that blood is not a product and does not come within provisions of the law pertaining to product liability or warranty.

> The implied warranties of merchantability and fitness shall not be applicable to the furnishing of human blood, blood plasma, or other human tissue or organs from a blood bank or reservoir of such other tissues or organs. Such blood, blood plasma or tissue or organs shall not ... be considered commodities subject to sale or barter, but shall be considered as medical services.

Tex.Bus. & Com.Code Ann. § 2.316(e) (Tex. UCC) (Vernon 1968). Because blood is not a product, Methodist cannot be held liable in this case under a theory of products liability.

Numerous courts that have interpreted "blood shield" statutes in the context of transfusion-associated AIDS cases have held that such persons cannot be held liable under theories of strict liability, products liability, or implied warranty. *See, e.g., Coffee v. Cutter Biological,* 809 F.2d 191, 193 (2d Cir.1987); *McKee,* 675 F.Supp. at

103

1063; *Kozup,* 663 F.Supp. at 1058; *Hyland Therapeutics v. Superior Court,* 175 Cal. App.3d 509, 220 Cal.Rptr. 590, 592 (1985); *Roberts v. Suburban Hosp. Ass'n,* 73 Md. App. 1, 532 A.2d 1081 (1987).

▮ The first premise of statutory construction is to give effect to the intent of the legislature as plainly expressed in the statute. *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 384 (Tex.1982). Legislative intent is the fundamental canon and the cardinal, primary, and paramount rule of construction, to which all other rules must yield. *City of Mason v. West Tex. Util. Co.,* 150 Tex. 18, 26, 237 S.W.2d 273, 278 (1951). Based on the plain meaning of the Texas "blood shield" statutes, the trial court did not err in granting summary judgment with respect to all allegations based on strict liability, products liability, or implied warranty.

Accordingly, appellants' assertion that appellees had a duty to warn of the risk of AIDS sounds in products liability. Since blood is not a product, Methodist had no duty to warn. Appellants' reliance on *Belle Bonfils Memorial Blood Bank v. Hansen,* 665 P.2d 118 (Colo.1983), is misplaced. *Belle Bonfils* recognized that significant distinctions exist between the provision of blood and the provision of consumer products. The Colorado Supreme Court concluded: "[T]he raison d'etre of strict liability is to force some hazardous products out of the market. The same rationale does not apply to blood or vaccines which are life-saving and which have no known substitutes." *Id.* at 124. Furthermore, after the *Belle Bonfils* suit was filed, the Colorado Legislature enacted statutes immunizing blood banks and hospitals from liability for all damages other than those caused by negligence or willful misconduct in carrying out transfusions. *Id.* at 120 n. 2. Texas has long afforded its citizens such "blood shield" protections.

Appellant's sixth point of error is overruled.

The judgment of the trial court is affirmed.