No. 12239

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

CHARLES A. HUTCHINS,

Plaintiff and Respondent,

-vs-

BLOOD SERVICES OF MONTANA, an Arizona
corporation, and BILLINGS DEACONESS
HOSPITAL, a Montana corporation,

Defendants and Appellants.

---

Appeal from:  District Court of the Thirteenth Judicial District,
Honorable Robert H. Wilson, Judge presiding.

Counsel of Record:

For Appellants:

Moulton, Bellingham, Longo and Mather, Billings,
Montana.
W. H. Bellingham argued, Billings, Montana.
Lewis and Roca, Phoenix, Arizona.
Douglas L. Irish argued, Phoenix, Arizona.

For Respondent:

Scott, Scott and Baugh, Billings, Montana.
Jeffrey J. Scott argued, Omaha, Nebraska.
G. Todd Baugh appeared, Billings, Montana.

---

Submitted:  January 22, 1973

Decided: FEB 14 1973

Filed: FEB 14 1973

Thomas J. Kearney

Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal from a judgment based on a jury verdict returned October 22, 1971, in Yellowstone County, in favor of plaintiff Charles A. Hutchins and against defendant Blood Services of Montana. Hutchins claimed Blood Services negligently caused him to contact serum hepatitis. The trial court denied defendant's motion for directed verdict at the close of plaintiff's case and again at the close of all the evidence. The trial court also denied defendant's combined motion for judgment notwithstanding the verdict and for new trial. This appeal is from the judgment as well as the denial of motions for a directed verdict, for judgment notwithstanding the verdict, and for a new trial.

Plaintiff Charles A. Hutchins, 56 years of age, underwent abdominal surgery in September 1966. During the course of that surgery he received two units of whole blood which was supplied by Blood Services of Montana.

Defendant is an Arizona corporation authorized to do business in the state of Montana under the name Blood Services of Montana. Blood Services is a nonprofit medically-sponsored community blood banking system which maintains 27 facilities serving about 850 hospitals in 18 states. It provides nearly 275,000 units of blood for transfusions annually.

In Montana, as elsewhere, Blood Services utilizes a variety of methods to persuade people to become blood donors, in order to obtain and maintain a constant supply of blood to fulfill its commitments to the communities it serves. It invites friends and relatives of patients who have received transfusions to replace blood used and thereby obtain a credit on the patient's hospital bill. Blood Services will arrange for the issuance of an insurance policy to a blood donor to insure him and his family against their potential blood needs for one year in exchange for a single donation. It will also make a donation in the donor's name to a charity of the donor's choice, if the donor so wishes.

When an individual presents himself as a prospective donor at Blood Services a determination is made, depending on the needs

- 2 -

of the community, if Blood Services will accept the service of such volunteer, if he is acceptable as a donor. In order to assure itself of a supply of volunteers, Blood Services compensates them for their availability and willingness to serve either by the insurance plan offered to all donors, or a charitable donation, or a direct payment in the amount of $5.

Blood Services' procedures for gathering, testing, processing and distributing blood are established in three sets of regulations: (1) Federal regulations issued by the United States Public Health Service, National Institutes of Health, Division of Biologic Standards, by which it is regularly inspected; (2) the accreditation standards of the American Association of Blood Banks, by which it is accredited and regularly inspected; and (3) its own internal Medical-Technical Procedures Manual, prepared by Dr. John B. Alsever, Blood Services' Vice-President for Medical Affairs, which manual meets or exceeds all requirements of the Public Health Service and the American Association of Blood Banks. Here, there was no contention that any regulation or procedure was violated by Blood Services.

On September 22, 1966, donor Sharon Holm, a 19 year old resident of Butte, felt and appeared to be in good health. She had never previously donated blood. At Blood Services' Butte facility where she donated, Sharon and her blood were screened, tested and processed by Blood Services' personnel in accordance with all of its standard testing and screening procedures. Sharon gave no history or indication from which it might be inferred she could be a hepatitis carrier. She was paid $5 by Blood Services for her donation of blood. Sharon Holm's blood was transfused to plaintiff Hutchins on September 29, 1966, while he was undergoing abdominal surgery. About three weeks after Hutchins received the blood, Sharon Holm, having been ill for a few days, was diagnosed as having hepatitis. Hutchins' doctors in Billings were immediately notified but it was too late and Hutchins also became ill with hepatitis.

Blood Services raises several issues on appeal. We will deal primarily with the question of whether plaintiff by sufficient evidence adequately established negligence, so as to create a jury question.

Plaintiff attempted to prove Blood Services was negligent in that it did not use a laboratory test known as the SGOT test/ on accepted blood and in the handling of the paid donor, since paid donors allegedly have a much higher rate of hepatitis than volunteer donors. We have reviewed the evidence in the light most favorable to the plaintiff and find plaintiff did not establish any case of negligence against Blood Services.

Plaintiff Hutchins asserted that Blood Services by its negligence caused him to contact serum hepatitis. He proffered two acts of negligence on Blood Services' part. In a negligence action it is encumbent upon the plaintiff to prove, among other elements, a duty owing from defendant to plaintiff and a breach of that duty. See: Pickett v. Kyger, 151 Mont. 87, 439 P.2d 57.

We first consider the allegation that Blood Services did not use the SGOT test. SGOT is a laboratory test developed and used for many years in following the clinical course of persons who are known to be ill. In general, it measures the level of a certain enzyme in the blood. Cells damaged by trauma or disease release this enzyme in the blood. Hence, an increased SGOT level may indicate there are damaged or diseased cells somewhere in the body.

It was Blood Services' failure to use the SGOT test that was charged as negligence. In 1966, when the incident in this case occurred, not a single blood bank in the nation had ever used the test to screen blood donors. In other words, the standard of care established throughout the nation was not to use the SGOT test. This same standard of care was established for Butte and Billings, Montana.

Plaintiff produced one witness, Dr. J. Garrott Allen, a professor of surgery at Stanford University and a practicing surgeon. Dr. Allen is a recognized expert in the field of what we will generally call blood. Over Blood Services' objection, Dr. Allen was allowed to express his opinion that if the SGOT test had been given to Sharon Holm at the time of the taking of her blood, it "probably" would have given a positive reaction. However, Dr. Allen testified that no blood bank in the United States, including his own hospital's blood bank in California, had ever used the SGOT test to screen donors.

Dr. Allen then, as well as all other witnesses, established a standard of care as regards the SGOT test, as a standard of not using the SGOT test. Neither Dr. Allen nor any other witness expressed the opinion: (a) that a blood bank's decision not to use the SGOT test was a deviation from, or contrary to, the approved custom or practice in any other blood bank, or (b) that the conclusion of the entire blood banking community not to perform this test deviated from what anyone would consider reasonable or prudent practice. Dr. Allen did say he personally would like it done on blood he receives. But, one person's preference does not establish a standard of care.

This was the only evidence offered by plaintiff. However, in order to prove a case of actionable negligence, plaintiff must do more than have an expert witness testify that he would like to have the test used. Plaintiff had to establish, by competent medical evidence, either that Blood Services did something blood bankers of ordinary care, skill and diligence would not have done under similar conditions, or it omitted to do something they would have done under similar circumstances. Here, it was established that no one in the blood banking business used the SGOT test to screen blood donors. Neither the government's regulating agency, the blood bankers' accrediting association, the

American Medical Association, nor anyone else in authority had ever asked blood bankers to use the SGOT test in screening donors.

It was established that Blood Services' decision was not to use the SGOT test. But the testimony of a professor at a medical school that he would like to have the test done on the blood he uses, does not establish a case of negligence. This Court stated in Mang v. Eliasson, 153 Mont. 431, 435, 458 P.2d 777:

> "An additional test of actionable negligence is not what might have prevented a particular accident, but what reasonably prudent men would have done in the discharge of their duties under the circumstances as they existed at the time of the accident. Milasevich v. Fox Western Montana Theatre Corp., 118 Mont. 265, 272, 165 P.2d 195."

Here then, we must look to what actually happened and what a reasonably prudent blood bank would have done in the same situation. Using that test, and considering the circumstances as they were in 1966, it was not negligence for Blood Services not to use the SGOT test, it acted as a reasonably prudent blood bank.

The uncontradicted circumstances at the time were: (a) no blook bank in the United States was using the SGOT test as a routine screening test; (b) neither federal regulations nor the accrediting standards of the American Association of Blood Banks required or had ever required the use of the SGOT test on prospective donors; (c) neither the Public Health Service, the American Association of Blood Banks of the American Medical Association Committee on Transplantation and Transfusion had ever recommended the use of SGOT testing; and (d) although some writers had suggested investigating the usefulness of SGOT for blood donors, those who were recognized as authorities in blood banking had concluded it was not a useful or meaningful test for purposes of screening blood donors. No witness, not even Dr. Allen, expressed the opinion that Blood Services' decision failed to comply with any standard of practice or recognized degree of care anywhere

other than in Dr. Allen's private preferences. This Court said in Dunn v. Beck, 80 Mont. 414, 423, 260 P. 1047:

> "'Nor does the fact that other physicians might have adopted other methods necessarily render the attending physician liable, nor show negligence or want of skill or care. If the method adopted * * * has substantial medical support, it is sufficient. * * * And, where there is a difference of opinion among practical and skillful surgeons as to the practice to be pursued in certain cases, a physician may exercise his own best judgment, employing the methods his experience may have shown to be best, and mere error of judgment will not make him liable in damages, in the absence of a showing of want of care and skill.'"

That standard is clearly applicable here. There was no evidence introduced to show that Blood Services failed to use care and skill, and it was established its practice was the same as all other blood banks. The public interest requires blood banks to be vigilant but this consideration would not justify the lowering of the standard of proof in cases of this kind, for in doing so the public interest would be ill served. If those who supply the very fluid of life were required, without the slightest evidence of deviation from approved medical practice, ipso facto to pay damages any time a person whose life they save suffers an untoward result, such a charitable nonprofit enterprise would be hazardous and self-defeating. We do not find from the evidence that Blood Services was negligent in not using the SGOT test.

The second alleged negligent act was that since Blood Services was using paid donors, it was negligent in not taking the necessary steps to make sure the blood from its paid donors was not infected.

Plaintiff's theory was that in accepting blood from Sharon Holm, a paid donor, the risk she would be carrying hepatitis was eleven times higher than a volunteer donor. Since this is a higher risk of hepatitis, plaintiff maintains Blood Services should have taken necessary steps to determine if the blood was infected.

This theory is based on studies of the types of people who exchange blood for money. It was Dr. Allen who had made part

of the studies and made the observation during trial that the risk when dealing with paid donors was much higher than when dealing with volunteers. Dr. Allen gave a two-fold basis upon which his opinion was based: (a) his own studies at the Illinois State Penitentiary, which showed prisoners in state penitentiaries carry a high hepatitis risk, and (b) studies of others which show that drug addicts, derelicts and skid-row bums all carry a high risk of hepatitis.

Even accepting everything plaintiff offers as true, that still does not show Blood Services was negligent when dealing with Sharon Holm. The uncontroverted evidence was that Sharon did not fall into the category of a dangerous donor such as prison inmates, bums, or addicts; she did not live in a slum or skid-row district; Blood Services does not accept, paid or not, the type of donor in the category Dr. Allen and others found to be dangerous; and Blood Services facilities were not located in a slum or skid-row district. The evidence of Dr. Allen on the risk of using paid donors was not applicable to the situation of Sharon Holm. There was no evidence to bring Sharon Holm within the circle of those persons whose blood is more likely to contain hepatitis than blood of the general population. It may be that prisoners, bums, and addicts who sell their blood are high risk donors, but it does not follow that everyone who sells his blood is a high risk donor. It is not negligence to offer to buy blood, when a blood bank finds that is the only way it can meet its obligations.

Since the only two acts of negligence relied upon by plaintiff failed to establish negligence, the case was improperly submitted to the jury.

Therefore, we order the judgment of the district court reversed and the cause dismissed.

Wesley Castles
Associate Justice

- 8 -

We Concur:

_James L. Harrison_
Chief Justice

_Gene B. Daly_

-------------------------------
Associate Justices.

Mr. Justice Frank I. Haswell took no part in this Opinion.

-----------------------

Mr. Justice John Conway Harrison concurring in part and dissenting in part:

I concur with the majority on issue one, that the case should be reversed, but I would return the case for a new trial.

I do not agree with the majority on issue two as to paid blood donors. The facts, as I understand them, concerning Sharon Holm would have made her a high risk donor. These facts brought out during trial need not be stated, but they did indicate that if defendant had made any inquiries she might not have been allowed to sell her blood.

Numerous cases have arisen in recent years where either hospitals have been sued or a private blood bank, as here, for imperfect blood. Hoffman v. Misericordia Hospital of Philadelphia, 439 Pa. 501, 267 A.2d 867, and cases cited therein. Some of these cases speak of an action in implied warranty ex contractue, and hold such an action cannot lie because the furnishing of blood is not a sale.

One court held that a distinction might possibly be drawn between a hospital that furnished medical services, and a blood bank which collected the blood and supplied it to the hospital. Koenig v. Milwaukee Blood Center, Inc., 23 Wis.2d 324, 127 N.W.2d 50.

- 9 -

I believe there is a distinction between a suit against a blood bank as opposed to a hospital. 103 U.Pa.L.Rev. 833; Gottsdanker v. Cutter Laboratories, 182 Cal.App.2d 602, 6 Cal. Rptr. 320, 79 ALR2d 290.

I think as a matter of public policy that we should depart from the "sale v. service" category and examine the issue here as one primarily involving the question of implied warranty. Here, expressions of sound policy preferences are more in harmony with the doctrine, which I feel should control. See Prosser, Strict Liability to the Consumer, 69 Yale Law Journal 1099, 1124. A hospital suppling whole blood to a patient may be merely performing service incident to the overall medical attention being furnished, such theory of "service" should not be extended to the private blood bank which collects and distributes the blood.

I would adopt the implied warranty theory as it applies to the case before us.

_John Conway Harrison_
Associate Justice