Anita HERNANDEZ, Appellant,

v.

NUECES COUNTY MEDICAL SOCIETY COMMUNITY BLOOD BANK, Appellee.

No. 13–89–094–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 1989.

Rehearing Dismissed as Moot Nov. 9, 1989.

Kenneth R. Hannam, Mahoney, Shaffer & Layton, Corpus Christi, for appellant.

Ronald B. Brin, Thomas F. Nye, Brin & Brin, Corpus Christi, for appellee.

Before BENAVIDES, UTTER and SEERDEN, JJ.

OPINION

BENAVIDES, Justice.

Appellant, Anita Hernandez, appeals from the granting of a summary judgment in favor of appellee, Nueces County Medical Society Community Blood Bank (hereinafter referred to as "the Blood Bank"). Appellant asserts two points of error for review. We reverse the judgment of the trial court.

The record reveals that on June 15, 1986, appellant was admitted into Spohn Hospital for the delivery of a baby by caesarean section. After the surgical procedure, four units of red blood were transfused into appellant's body. It is undisputed that approximately one month after the transfusion, appellant became ill, was hospitalized and was diagnosed as suffering from non-A, non-B hepatitis. Thereafter, appellant brought a personal injury action against the Blood Bank alleging that it was negligent in failing to conduct two surrogate screening tests (the ALT test and the Core test) on the donor blood that she received after her surgery.

The record reveals that there are no "direct" tests that can diagnose non-A, non-B hepatitis. There are, however, two surrogate tests (the ALT and Core tests) which can indicate the presence or the likelihood of the disease. It was undisputed that at the time appellant received her transfusion, neither the Food and Drug Administration (FDA) nor the American Association of Blood Banks (AABB) recommended or required the use of ALT or Core testing on donor blood.[1] However, it was also established that a few months after appellant received the transfusion, the AABB recommended and eventually required that all blood banks test every unit of donor blood for the presence of non-A, non-B hepatitis by using the ALT and Core tests.

The Blood Bank moved for summary judgment alleging that it was entitled to judgment as a matter of law because in May and June of 1986 it had performed all tests *required and recommended by the AABB and the FDA*. It argued that since neither the AABB nor the FDA required or recommended the use of these surrogate tests on donor blood in May and June of 1986, the evidence conclusively established that it had complied with the requisite standard of care. The trial court granted the motion and rendered judgment in favor of the Blood Bank.

By her first point of error, appellant contends that the trial court committed error in granting a summary judgment because there were material issues of fact. Specifically, she argues that the summary judgment evidence created questions of fact concerning whether the Blood Bank was negligent in failing to administer the ALT and Core tests before June of 1986, notwithstanding the fact that these tests were not yet required or recommended by the AABB.

In reviewing a summary judgment, we follow the well-established rules set out in *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Major Investments, Inc. v. DeCastillo*, 673 S.W.2d 276, 279 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.); *First Federal Savings & Loan Association v. Ritenour*, 704 S.W.2d 895, 901 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). The movant's burden is to show that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law. The reviewing court, in determining whether a fact issue exists, must take all evidence favorable to the non-movant as true. Every reasonable inference must be indulged, and every doubt resolved, in favor of the non-movant.

In support of its judgment, the Blood Bank initially relied on the affidavits of Dr. Kirby Barker, the Medical Director of the Blood Bank; Lester Keener, a Certified Medical Laboratory Technician employed by the Blood Bank; and Lynn Survant, the executive director of the Blood Bank. All three affiants attested that the Blood Bank conducted every test recommended and required by the FDA and the AABB on the donor blood transfused into appellant.

---

1. The AABB is the national licensing agency for all blood banks in the United States.

Dr. Barker attested in his affidavit that he was familiar with the requisite standard of care applicable to the procedures for testing donor blood in May and June of 1986. He concluded that the tests conducted on the blood received by appellant in June of 1986, were done in accordance with the accepted standard of care "as defined, regulated, required, recommended, and controlled by the Food and Drug Administration, by the American Association of Blood Banks, and medical standards of the community." He concluded that *since neither the FDA nor the AABB required or recommended* that the ALT or Core tests be performed on donor blood in May and June of 1986, the Blood Bank was not negligent in failing to perform such tests in May and June of 1986.

In order to controvert the Blood Bank's summary judgment evidence, appellant attached portions of Dr. Barker's deposition which was taken before the hearing. In his deposition, Barker acknowledged that approximately 6 to 10 percent of all people who get blood transfusions contract some form of hepatitis. He testified that approximately 90 percent of the post-transfusion hepatitis cases are of the non-A, non-B type. He further acknowledged that this type of hepatitis can be fatal. Barker admitted that the medical profession has been aware of these risks for many years prior to appellant's transfusion, and that blood banks should do all they can to prevent the occurrence of post-transfusion hepatitis.

In his deposition, he further testified that the medical profession had been aware of the ALT and Core tests for many years prior to appellant's transfusion. Barker additionally testified that it was "common knowledge" among the medical community that there was significant correlation between the results of the surrogate tests and the presence of the non-A, non-B hepatitis virus. In fact, Dr. Barker testified that he knew for a fact that the National Institute of Health was using the ALT test before May 5, 1986, and he "guessed" that other blood banks were conducting surrogate tests on donor blood prior to the date of appellant's transfusion. Barker also acknowledged that in 1984 the Blood Bank utilized a form entitled "post-transfusion hepatitis report," which indicated that the Blood Bank was indeed conducting ALT tests before it was mandated by the AABB. It was Barker's opinion that the ALT and Core tests should *now* be conducted on all units of donor blood.

The record reveals that appellant also attached to her response various documents, statements, and letters issued by the AABB and received by the Blood Bank. These documents, statements, and letters established that: (1) the AABB recommendations and requirements were minimum licensing requirements which could be exceeded by the practicing blood banks; (2) three months *prior* to appellant's transfusion, the AABB issued a statement informing all blood banks that the AABB and American Red Cross recommended that donor services begin planning to implement surrogate testing of donor blood to reduce the risk of non-A, non-B post-transfusion hepatitis; and (3) in August of 1986, just two months after appellant's transfusion, the AABB issued a statement which recommended that all donor services begin using the ALT and Core tests on all units for routine transfusions by November 1986.

Appellant also filed with the trial court affidavits of Dr. Ronald Gilcher (the Medical Director and Chief Executive Officer of the Oklahoma Blood Institute), Dr. Harvey Klein, (the Chief of the Department of Transfusions at the National Institute of Health), and Dr. Celso Bianco (Director of Research and Development of the New York Blood Center). All three doctors attested that their respective blood banks started using the surrogate tests on all donor blood long before the AABB mandate and appellant's transfusion. According to the three affiants, they began to use these surrogate tests in order to reduce the incidence of post-transfusion non-A, non-B hepatitis.

Dr. Gilcher stated that the Oklahoma blood bank began using the ALT test in April of 1983. He stated that the testing was "initiated *following* pilot studies ... which made me believe we could reduce the incidence of non-A, non-B hepatitis through

the use of this test." He further stated that his blood bank began conducting the Core test in April of 1986 (three months prior to appellant's transfusion).

Dr. Harvey Klein testified in his affidavit that the Blood Banks of the National Institutes of Health have been using the ALT test on every unit of donor blood since January 2, 1981. He stated that they began using the ALT test after a study on such test had been completed and published in the New England Journal of Medicine. Dr. Klein further testified that the National Institutes of Health have been using the Core test as a surrogate marker since January 2, 1986. Dr. Klein attested that he was "of the opinion that all blood banks throughout the United States certainly should have been using ALT testing ... well before June 15, 1986" and that "Core testing should have been performed by all blood banks on every unit of donor blood ... before June 15, 1986."

Dr. Bianco testified that the New York Blood Center began using the ALT test in 1982.

The record reflects that on the day of the hearing of the motion, the Blood Bank obtained leave to file and filed with the trial court "addendums" to the above doctors' depositions. Dr. Gilcher, in his addendum, stated that the testing done by the Oklahoma Blood Institute was for research purposes with the intent of attempting to reduce the transmission of non-A, non-B hepatitis through transfusions by the use of these two surrogate marker tests. He further attested that in his opinion the Blood Bank was not negligent in failing to use the ALT and Core tests in June of 1986 because the standard of care for blood banks in the United States, in May and June of 1986, "as *directed by the American Association of Blood Banks and the Bureau of Biologics [FDA]*," did not require the use of such tests (emphasis ours).

Dr. Klein attested in the addendum to his affidavit that "I am not saying that I know what defines the standard of care for blood banks in May and June of 1986 nor am I saying that the Nueces County [sic] Blood Bank breached the then existing standard of care in May and June of 1986."

Dr. Bianco stated in the addendum to his affidavit that "[t]he standard of care for blood banks in the United States, in May and June of 1986, *as recommended by the American Association of Blood Banks*, did not include the use of the ALT and/or [Core] tests (emphasis ours)."

The Blood Bank, citing *Hines v. St. Joseph's Hospital*, 86 N.M. 763, 527 P.2d 1075, *cert. denied*, 87 N.M. 111, 529 P.2d 1232 (1974) and *Hutchins v. Blood Services of Montana*, 161 Mont. 359, 506 P.2d 449 (1973), contends on appeal that the above summary judgment evidence established that it was entitled to judgment as a matter of law. It argues that all experts who testified, even those relied upon by appellant, agreed that the standard of care for blood banks in the United States in May and June of 1986, did not include the use of ALT or Core testing on donor blood. Accordingly, the Blood Bank asserts that there was no question of fact presented since appellant offered no expert testimony which articulated a different standard of care or established that the Blood Bank fell below the acceptable standard of care. It further contends that Dr. Klein's opinion that all blood banks should have been using the surrogate tests prior to June of 1986, was a personal opinion which could not establish the standard of care.

While we agree with the Blood Bank that Dr. Klein's personal opinions cannot establish the requisite standard of care, we do not agree with its assertions that there was no fact issue presented in the instant case. *See Stanton v. Westbrook*, 598 S.W.2d 331 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); *Smith v. Guthrie*, 557 S.W.2d 163 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n.r.e.).

It is well-established in Texas that in order to prove the negligence of a health care provider, a plaintiff must prove by competent medical evidence, either that the defendant health care provider did something which other health care providers of ordinary care, skill and diligence would not have done under the same or similar condi-

tions, or that it failed to do something that they would have done under the same or similar circumstances. *Birchfield v. Texarkana Memorial Hospital,* 747 S.W.2d 361, 366 (Tex.1987); *Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977); *see also Hutchins,* 506 P.2d at 452.

■ We acknowledge that no expert specifically articulated an opinion that the defendant Blood Bank breached the standard of care; however, those experts who testified that the Blood Bank did not breach the standard of care stated that the AABB and the FDA defined the requisite standard of care. We are of the opinion that, under the facts of this case, evidence of compliance with federal and minimum licensing standards does not conclusively establish the standard of care owed by the Blood Bank to its patients.

It is well-established that state health regulations, national standards, and organizational bylaws are admissible to define the standard of care customarily offered; however, such evidence does not *usually* conclusively establish that a health care provider fulfilled its duty of care to its patients and it does not necessarily preclude a finding of negligence. *Golden Villa Nursing Home, Inc. v. Smith,* 674 S.W.2d 343, 349 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Rather, evidence of such standards performs the same function as does evidence of custom, in that it is only one factor to consider when determining good, prudent medical care. *Cf. Helling v. Carey,* 83 Wash.2d 514, 519 P.2d 981, 983 (1974).

In *Helling,* the Supreme Court of Washington held that the defendant physician was negligent as a matter of law in failing to administer a diagnostic test to the plaintiff, even though there was uncontradicted expert testimony that it was the universal practice of such physicians not to routinely administer the test. *Id.* The Court found that the evidence conclusively established that the profession should have required the routine performance of such test. *Id.* The Court relied on the opinion of *In the Matter of T.J. Hooper,* 60 F.2d 737, 740

(2nd Cir.1983) in which Justice Hand stated that:

[I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adopting of new and available devices. It never may set its own tests, however persuasive be its usages. *Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.* *Helling,* 519 P.2d at 983.

Since, in the instant case, there was evidence that the Blood Bank may have unduly lagged in the adoption of new screening procedures, we hold that evidence of compliance with federal and minimum licensing standards does not *conclusively* insulate the Blood Bank from liability. Likewise, we find that the Blood Bank's reliance on *Hines* and *Hutchins* is misplaced since both cases are clearly distinguishable from the case now before us.

In both *Hines* and *Hutchins,* plaintiffs brought suit against various blood services alleging that the blood services negligently caused them to contract serum hepatitis (a different strand of hepatitis than the non-A, non-B type) by failing to perform the "SGOT" test. *Hines,* 527 P.2d at 1076; *Hutchins,* 506 P.2d at 450. In both cases, the evidence established that the defendant blood banks complied with all existing federal regulations, all accreditation standards of the AABB, and their own internal regulations. *Hines,* 527 P.2d at 1078; *Hutchins,* 506 P.2d at 450–51. The only evidence offered by the plaintiffs were assertions by doctors that they thought the standards should be changed or that they would like to see the test performed. *Hines,* 527 P.2d at 1078; *Hutchins,* 506 P.2d at 452. The courts held that the defendant blood services were not negligent in failing to use the SGOT test since the evidence established that they had conformed to the requisite standard of care. *Hines,* 527 P.2d at 1078; *Hutchins,* 506 P.2d at 452. The courts held that in order to prove an actionable cause of negligence, a plaintiff must do more than have an expert witness testify that he would like to have the test used.

*Hines,* 527 P.2d at 1078; *Hutchins,* 506 P.2d at 452.

It is important to note that in *Hines* and *Hutchins* there was no evidence that other blood banks used the test to reduce the incidence of post-transfusion hepatitis. Likewise, there was no evidence which indicated that AABB would soon recommend or require the use of such test. In fact, the court in *Hutchins* noted that the undisputed evidence showed that "(a) no blood bank in the United States was using the SGOT test as a routine screening test; (b) neither federal regulations nor the accrediting standards of the AABB required *or have ever required* the use of the SGOT test on prospective donors; ... (d) although some writers had suggested *investigating* the usefulness of SGOT for blood donors, those who were recognized as authorities in blood banking had concluded it was not a useful or meaningful test for purposes of screening blood donors (emphasis ours)." *Hutchins,* 506 P.2d at 452.

█ In contrast to *Hines* and *Hutchins,* the evidence in the instant case establishes that: (1) other blood banks used surrogate tests before appellant's transfusion and prior to the AABB mandate; (2) the medical community found these tests to be useful in the reduction of the incidence of non-A, non-B hepatitis; (3) three months before appellant's transfusion, the Blood Bank became aware of the fact that the AABB would soon be changing its standards to require the use of surrogate tests; and (4) shortly after appellant's transfusion the AABB did in fact recommend and require the use of the surrogate tests. Furthermore, there was evidence in the instant case which indicated that the Blood Bank itself used the ALT test three years before appellant's transfusion.

Accordingly, we find that under the facts of the instant case, the mere compliance with federal and accreditation standards does not conclusively insulate the Blood Bank from liability. The summary judgment evidence created a fact issue concerning the reasonableness of the Blood Bank's failure to use the surrogate testing, notwithstanding the fact that it was not yet required by the AABB and the FDA. Appellant's first point of error is sustained. Because appellant's first point is dispositive of this appeal, we need not address appellant's second point of error.

The judgment of the trial court is reversed and the cause is remanded for a trial on the merits.