**Encarnation JAIME, Individually and as Next Friend of Humberto R. Jaime, a Minor, Appellant,**

v.

**ST. JOSEPH HOSPITAL FOUNDATION, Appellee.**

No. 01–92–00207–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 18, 1993.

Constance Y. Singleton, Houston, for appellant.

Jeffrey B. McClure, Griffin Vincent, Houston, for appellee.

Before COHEN, MIRABAL and PRICE *, JJ.

## OPINION

COHEN, Justice.

This is an appeal from a summary judgment granted in favor of appellee, St. Joseph Hospital Foundation (the Hospital).

---

* Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

Appellant alleged Encarnation Jaime contracted Acquired Immune Deficiency Syndrome (AIDS) from a blood transfusion she received at the Hospital in December of 1982, prior to surgery there. Jaime was admitted on December 7, 1982 for the delivery of her first child. The Hospital discharged Jaime and her baby on December 11. Jaime was re-admitted later on December 11, however, due to postpartum vaginal bleeding. Surgery was conducted (a curettage of the uterus). In preparation for that surgery, the Hospital gave Jaime a blood transfusion with blood supplied by the Gulf Coast Regional Blood Center (Gulf Coast). Appellant alleged the blood was contaminated with AIDS. Jaime ultimately died of AIDS related complications.

Prior to Jaime's death, she sued the treating physician, Margaret L. Condit, M.D., and the Hospital for medical malpractice. Appellant later nonsuited the physician. Concerning the Hospital, appellant alleged: (1) the mother's loss of blood was negligently caused by the Hospital; (2) the transfusion was unnecessary; (3) the Hospital negligently failed to screen blood donors, or negligently failed to require the blood bank, Gulf Coast, to screen blood donors; and (4) the Hospital negligently failed to employ surrogate tests on blood for hepatitis, which fortuitously would have reduced by 88 percent the risk of receiving AIDS-tainted blood.[1]

The four essential elements of a medical negligence claim are: (1) a duty to conform to a certain standard of care; (2) a failure to conform to the required standard; (3) actual injury; and (4) a reasonably close causal connection between the conduct and the injury. *Tilotta v. Goodall,* 752 S.W.2d 160, 161 (Tex.App.—Houston [1st Dist.] 1988, writ denied). The plaintiff must prove by competent medical evidence, either that the defendant did something other health care providers using ordinary care would not have done or that it failed to do something they would have done under the same circumstances. *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 366 (Tex.1987).

A defendant seeking summary judgment must prove conclusively that the plaintiff cannot prevail. *Griffin v. Rowden,* 654 S.W.2d 435, 435–36 (Tex.1983). This may be accomplished by showing at least one element of the plaintiff's claim has been established conclusively against the plaintiff. *Gray v. Bertrand,* 723 S.W.2d 957, 958 (Tex.1987). When the defendant has produced competent evidence to negate a necessary element of the plaintiff's cause of action, the plaintiff must then introduce evidence that raises a fact issue with respect to the element the defendant seeks to negate. *Sakowitz Inc. v. Steck,* 669 S.W.2d 105, 107–08 (Tex.1984). Summary judgment for the defendant is proper only if, as a matter of law, the plaintiff cannot succeed on any theory pled. *Delgado v. Burns,* 656 S.W.2d 428, 429 (Tex.1983).

We must take all evidence favorable to the nonmovant as true and grant every reasonable inference in favor of the nonmoving party. *Nixon v. Mr. Property*

1. On appeal, appellee complains in several instances that appellant never identified in the petition any specific instances of negligence. Appellant's First Amended Original Petition, in pertinent part, reads:

Plaintiffs bring this action against the Named Defendants [the physician and the Hospital] for their negligence and malpractice in the treatment of Plaintiff, ENCARNATION CHITA JAIME, during December, 1982, when she was injured by the improper treatment, care and handling by Defendants causing her to contract AIDS.

Appellant's pleadings are general. Appellee, however, never filed special exceptions. In fact, in her motions, responses, briefs, and summary judgment evidence, appellant did raise the four

claims of alleged negligence. Moreover, appellee responded at the trial court to these four allegations of negligence. Unpled claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised in the pleadings. *Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 495 (Tex.1991). The party who allows an issue to be tried by consent and who fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal. *Id.* These rules also apply to issues raised in summary judgment proceedings. *Id.* Thus, we will consider the four allegations the actual basis of appellant's claim.

*Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Moreover, when the trial judge's order does not specify the grounds for the ruling, the summary judgment will be affirmed if any ground is meritorious. *Insurance Co. of North Am. v. Security Ins. Co.,* 790 S.W.2d 407, 410 (Tex.App.— Houston [1st Dist.] 1990, no writ).

### Loss of Blood and Unnecessary Transfusion

The Hospital denied that it negligently caused Jaime's loss of blood and that the transfusion was unnecessary, offering Dr. Miller's affidavit. Appellant offered no affidavit to controvert this summary judgment proof. In the fourth point of error, appellant claims Dr. Miller's affidavit did not establish the standard of care, thus, summary judgment was improper.

In medical negligence cases, the court must be guided solely by the expert opinion. *Wheeler v. Aldama-Luebbert,* 707 S.W.2d 213, 215 (Tex.App.—Houston [1st Dist.] 1986, no writ). A summary judgment may be based on an expert's uncontroverted testimony if the testimony is clear, positive, direct, otherwise credible, and free from contradictions and inconsistencies, and capable of being readily controverted. *Republic Nat'l Leasing Corp. v. Schindler,* 717 S.W.2d 606, 607 (Tex. 1986); Tex.R.Civ.P. 166a(c).

Dr. Miller's affidavit, regarding the Hospital's alleged negligence, states:[2]

I am familiar with the standard of care applicable to prenatal and perinatal nursing care and examinations in Houston, Texas, in 1982. It is also my expert opinion that the examinations and treatments of Ms. Jaime performed by the nursing staff were in accordance with the appropriate standard of care. From the nursing record it appears that Ms. Jaime's postpartum stay was uneventful. The only progress note worth attention was written on 12/8/82 at 10:45 a.m., Ms. Jaime's hemoglobin and hematocrit were noted to be 9.1 and 26.0, respectively,

and her white blood cell count was noted to be 15,200. This indicates the patient was anemic due to the blood loss during delivery. The applicable standard of care dictates that special treatment, such as a blood transfusion or curettage, is generally not indicated for a patient who is in this anemic condition but not actively bleeding and who does not require surgery. Thus, the actions of the nursing staff were within the applicable standard of care because Ms. Jaime's condition did indicate a need for special care. It is my expert opinion that such blood loss is not uncommon for a young, eighteen year old woman who has delivered a large, 8.9 pound baby. The remainder of the progress notes do not indicate any further problems with Ms. Jaime's postpartum recovery.

I am familiar with the standard of care in Houston, Texas in 1982 which was applicable to a patient who is readmitted with post-partum vaginal bleeding. Pursuant to the applicable standard of care, a curettage of the uterus was indicated for a patient who is re-admitted with postpartum vaginal bleeding. The applicable standard of care also indicated that the scrapings obtained from the curettage be sent to pathology for microscopic review. When Ms. Jaime was re-admitted to St. Joseph on December 11, 1982, she was diagnosed as having postpartum vaginal bleeding. The nurse's notes indicate that the patient underwent a curettage of the uterus which was appropriate under the standard of care. The pathology reports of the uterine scrapings identified degenerated decidual tissue and fragments of regressing gestational endometrium. Under the applicable standard of care, the postpartum retention of these microscopic fragments does not indicate that the placenta was not in fact delivered whole or inconsistent with an inspection of the placenta to ensure that it has been delivered whole. She recovered postoperatively without any difficulties. The

---

2. Other parts of Dr. Miller's affidavit discussed the physician's standard of care, as it pertained to Dr. Condit, the treating physician who was nonsuited, and the standard of care for monitoring the blood supply.

nursing documentation shows that at all times the patient was appropriately monitored.

Prior to her surgery, Ms. Jaime was given a blood transfusion. This transfusion was necessary because the patient's admission laboratory values showed a low hemoglobin. The 1982 standard of care dictates that a blood transfusion is indicated for any patient who is actively bleeding with a low blood count. Thus, the transfusion was necessary and the hospital was following the applicable standard of care in performing the transfusion.

I have reviewed Plaintiff's First Amended Original Petition and each of the allegations of negligence and gross negligence contained in that instrument. Based on my education, training, experience, and expertise, it is my opinion that each of the allegations is without merit. The examinations and treatments rendered for Ms. Jaime by all St. Joseph personnel were performed correctly and properly and were consistent with the appropriate standard of care. Furthermore, it is my expert opinion that no act of omission on the part of St. Joseph Hospital caused any of the damages Plaintiffs now complain of in Plaintiff's First Amended Original Petition.

■ The threshold question in a medical malpractice case is the standard of care. It must be established so that the fact finder can determine if the defendant deviated from it. *See generally Tilotta*, 752 S.W.2d at 161–65; *Wheeler*, 707 S.W.2d at 216. An expert cannot merely state he knows the standard of care and conclude that it was met. The expert must state what the standard is and say what was done to meet it. *Nicholson v. Naficy*, 747 S.W.2d 3, 4–5 (Tex.App.—Houston [1st Dist.] 1987, no writ); *Hammonds v. Thomas*, 770 S.W.2d 1, 2 (Tex.App.—Texarkana 1989, no writ). Affidavits that merely state conclusions rather than facts are insufficient *Martin v. Petta*, 694 S.W.2d 233, 238 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.).

■ Appellant claims Dr. Miller's affidavit is insufficient because (1) it fails to identify the Hospital's standard of care; (2) Miller's opinions are general conclusions that are incapable of being controverted; and (3) the affidavit does not state why the transfusion was needed. We disagree.

In the part of the affidavit quoted extensively above, Dr. Miller discussed the standard of care and the conduct of the nursing staff by reviewing medical records concerning appellant's condition and the response to it. The affidavit states why the transfusion was necessary by stating that the standard of care dictates a blood transfusion be given to any patient who was actively bleeding with a low blood count; the affidavit states that appellant was actively bleeding with a low blood count at the time she received a transfusion and that the transfusion was necessary to treat that condition. Doctor Miller's conclusions were capable of being controverted.

For example, Miller concluded the nursing record shows that appellant's postpartum stay was uneventful, and that the only important progress note showed that on 12-8-82, at 10:45 a.m., appellant was anemic due to blood loss during delivery. The affidavit states that the anemia was caused by a blood loss normal for an 18 year old woman delivering a large, 8.9 pound baby. If such blood loss was not normal for such a patient, an expert for appellant could have controverted Dr. Miller's statement. In addition, Dr. Miller's conclusions about the progress notes could have been controverted by any expert who reviewed the nursing records and found significant progress notes showing difficulties in appellant's postpartum recovery.

Dr. Miller's later statement can also be controverted. He stated that the Hospital acted properly in performing a blood transfusion because the transfusion was indicated by records showing Jaime's active bleeding and low blood count. If the records did not show active bleeding or low blood count, or showed any other conditions that made a transfusion inappropriate, an expert could have reviewed the records and controverted Dr. Miller's statements.

Moreover, Dr. Miller's affidavit outlines that the standard of care did not call for a transfusion on December 8, when appellant was not actively bleeding and did not require surgery, and he states that is why none was given then. Further, Dr. Miller stated that the standard of care required the Hospital to perform a blood transfusion for a patient actively bleeding with low blood count, and that was done on December 11. Thus, he states that the Hospital followed the correct standard of care by not giving a transfusion on December 8 and also by giving one on December 11. In sum, this affidavit is as good as those held sufficient in *Cedillo v. Jefferson,* 802 S.W.2d 866, 870 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *White v. Wah,* 789 S.W.2d 312, 316–18 (Tex.App.—Houston [1st Dist.] 1990, no writ); *Tilotta,* 752 S.W.2d at 162–64; and *Wheeler,* 707 S.W.2d at 215–17.

Point of error four is overruled.

### Blood Donor Screening

In portions of her first, second, fifth, and sixth points of error, appellant claims fact issues remain about whether the Hospital adequately screened blood donors.

■ Appellant alleged that the Hospital should have screened out, or forced the blood bank to screen out, blood donors who were members of high risk groups. Appellant alleged the high risk groups consisted of homosexuals, bisexuals, intravenous drug users, and anyone with a history of viral hepatitis. Appellant claimed this duty arose in part from the requirements within 21 C.F.R. § 640.3 (1982),[3] and that the hos-

pital's breach of this duty was the proximate cause of Jaime's death.

To refute this claim, the Hospital relied on the affidavit of Dr. Jeffrey Terrel, who stated that, between 1977 and 1982, the Hospital did not draw blood from donors on-site. During that period, the Hospital obtained all of its blood from the Gulf Coast Regional Blood Center. Thus, appellee claimed it had no duty to screen, relying on *Gibson v. Methodist Hospital,* 822 S.W.2d 95 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

In *Gibson,* the plaintiff alleged she contracted AIDS from a blood transfusion on March 8, 1983, at Methodist Hospital. 822 S.W.2d at 97. The blood was collected and supplied to Methodist by Gulf Coast Regional Blood Center, the same supplier here. *Id.* Gibson alleged that Methodist negligently failed to screen blood donors. *Id.* at 99. As in this case, the blood transfused into Gibson was not drawn at the hospital, but was obtained from a blood bank that was not a party to the appeal. *Id.* Thus, this Court held that "appellants' arguments pertaining to improper donor screening are inapplicable to Methodist [the hospital]." 822 S.W.2d at 99.

Appellant contends this case differs from *Gibson* because, here, Dr. Terrel's affidavit showed the Hospital had its own blood bank. Terrel stated that his "responsibilities included being apprised of the origin of [that] Blood Bank's blood supply." This, appellant argues, indicates the Hospital undertook donor screening and negligently failed to perform those duties. We disagree. Even viewed most favorably to appellant, Terrel's affidavit cannot be stretched to mean the Hospital undertook

---

**3.** 21 C.F.R. § 640.3 read, in pertinent part:

(a) *Method of determining.* The suitability of a donor as a source of Whole Blood (Human) shall be determined by a qualified physician (or his agents) ... *on the day of collection from a donor* by means of a medical history, a test for hemoglobin level, and such physical examination as appears necessary to a physician who shall be present on the premises when examinations are made....

(b) *Qualifications of donor; general.* Except as provided in paragraph (f), a person may not serve as a source of Whole Blood (Human) more than once in 8 weeks. In addi-

tion, donors shall be in good health, as indicated in part by:

(6) Freedom from any disease transmissible by blood transfusion, insofar as can be determined by history and examinations indicated above;

(c) *Additional qualifications of donor; viral hepatitis.* No individual shall be used as a source of Whole Blood (Human) if he has—

(1) A history of viral hepatitis

(2) A history of close contact within six months of donation with an individual having viral hepatitis.

the duty of screening donors at an independent blood bank off the hospital premises. Terrel's statement simply means that he knew their blood came from Gulf Coast, and was not drawn at the hospital.

 Finally, appellant argues this case differs from *Gibson* because, here, the Hospital failed to refute the allegation that Gulf Coast collected the blood in violation of 21 C.F.R. § 640.3, which required all blood donors be interviewed and screened properly in order to eliminate high risk donors. That section requires that the donor's suitability to give blood be determined "on the day of collection from the donor by ... a physician who shall be present on the premises when examinations are made." Thus, section 640.3(a) plainly puts that responsibility on the collector of the blood. The Hospital did not collect the blood. Thus, it did not violate 21 C.F.R. § 640.3. Appellant presented no evidence of any hospital in the country that was responsible for screening donors from an independent blood bank. We consider *Gibson* to be controlling authority on this point. *Gibson*, 822 S.W.2d at 99.

### Surrogate Testing of Blood

 In portions of her first, second, fifth, and sixth points of error, appellant claims that fact questions remain regarding whether the Hospital should have performed surrogate AIDS tests on the blood or, alternatively, should have demanded that Gulf Coast perform the surrogate tests.

Appellant did not allege that, at the time of Jaime's transfusion, there was a test specifically for AIDS that the Hospital could have performed on the blood. Instead, appellant alleged that in December of 1982, the Hospital should have been screening the blood for hepatitis. The main groups then known to be at risk for hepatitis were homosexuals, bisexuals, and intravenous drug users. Appellant claims these same groups were also known to be at risk for AIDS. Appellant suggests, therefore, that the Hospital should have used the tests designed to screen hepatitis-tainted blood as surrogate tests to screen

AIDS-tainted blood. Specifically, appellant focuses on two tests that were then available to screen blood for hepatitis, the Hepatitis B Core Antibody Test (CORE), and the test for non-A/non-B Hepatitis, alanine aminotransferase (ALT). Appellant argues that, in light of what is now known about AIDS, had the Hospital implemented those surrogate tests then, they would have screened out up to 88 percent of the AIDS-contaminated blood.

The Hospital claimed the applicable standard of care in December of 1982 did not require these surrogate hepatitis tests to protect patients from AIDS, relying on affidavits from Harold Miller, M.D., and John D. Milam, M.D.

Dr. Miller swore he was familiar with the standard of care in Houston, in 1982, for monitoring blood supplies for the AIDS virus, and that in 1982, no organization in the country recommended blood screening to prevent infection with AIDS because there were no tests to monitor the blood supply for the AIDS virus. It was not until 1984 that the medical community reached a consensus that AIDS was transmissible by a blood borne agent. Thus, he concludes, "the Hospital was not required and could not possibly monitor its blood supply for the AIDS virus."

Dr. John D. Milam, M.D., an expert in blood banking, hematology, and pathology, swore that in 1982, effective surrogate tests for AIDS were not recognized within the medical community of Houston. He stated that before the development of the effective test for AIDS in 1985:

various surrogate tests had been duly considered for detecting the presence of the apparently transmissible agent responsible for AIDS. The use of these surrogate tests for AIDS and screening of blood donor units was not recommended by the Blood Products Advisory Committee of the FDA, other groups of the FDA, the Center for Disease Control, the American Association of Blood Banks, the American Red Cross, the Council of Community Centers, the American Blood Commission, or the U.S. Department of Health and Human Ser-

vices. Prior to March of 1985, at which time the ELISA test for anti-HIV was licensed and became available, evidence of the effectiveness of the surrogate test was lacking. Prior to March of 1985, it was not the standard of care in Houston, Harris County, Texas to utilize surrogate laboratory tests to screen blood units to prevent transfusion-associated AIDS.

Milam also states that in February of 1986, at a meeting of the Blood Products Advisory Committee of the FDA, it was recommended that blood banks perform additional tests to enhance the safety of the nation's blood supply. These two tests were the ALT and the CORE tests. By November 30, 1986, all 2,300 institutional members of the American Association of Blood Banks were implementing these two additional tests.

In opposition to the summary judgment, appellant relied on the affidavit of Melvin N. Kramer, Ph.D., an epidemiologist with a masters degree in public health from Johns Hopkins University in environmental health and epidemiology, and a doctor of philosophy degree in environmental health from Pacific Western University. The Hospital contends that Dr. Kramer is not a competent expert witness under Tex.R.Civ.Evid. 702, an objection it made in the trial court. In light of our holding, we need not reach that issue.

Dr. Kramer swore he was "familiar with the applicable standard of care relating to the procedures which [sic] employed by blood centers and hospitals dispensing blood, blood products, and blood derivatives." He identified the Code of Federal Regulations as the standard of care in 1982, specifically, 21 C.F.R. § 640.3 and 640.3(c)(1)(1982), which required blood donors to be free from disease transmissible by blood transfusion. Dr. Kramer identified several diseases known in 1982 to be transmitted by blood transfusion, including Hepatitis B, non-A/non-B Hepatitis, Cytmegalovirus (CMV), and Epstein–Barr Virus (EBV). He stated that by September of 1982, an issue of the Morbidity and Mortality Weekly Reports (MMWR), published by the Center for Disease Control (CDC), reported that the possible cause for AIDS was carried in blood. In early November 1982, the MMWR published an article warning that "blood and organs of AIDS patients should not be donated." The article also recommended the same precautions for caring for patients with AIDS as those used for patients with Hepatitis B infections. Kramer states that at the time of Jaime's transfusion, it was known that those at increased risk for hepatitis infections were homosexuals, bisexuals, and intravenous drug users, the same groups at increased risk for AIDS infections.

Dr. Kramer swore that in 1982, contracting hepatitis infections was a substantial risk for those receiving a blood transfusion. Consequently, surrogate tests for nonA/nonB Hepatitis, including the ALT test, were employed by blood centers "throughout the U.S.," including the Marion County Blood Center in Indianapolis, the NIH Clinical Center Blood Bank, and The New York Blood Center. These centers all employed the tests for hepatitis prior to the time of Jaime's transfusion. Moreover, also available at that time was the CORE test for the Hepatitis B virus. Kramer concluded that if St. Joseph Hospital had implemented this CORE test, they would have reduced up to 88 percent of Jaime's risk of receiving blood contaminated with the AIDS virus.

Dr. Kramer also stated that on January 4, 1983, at a meeting with the blood industry, Dr. Thomas Spira of the Center for Disease Control presented data on surrogate laboratory tests that could identify those individuals considered at high risk for transmitting AIDS.[4] The response from the blood industry was that the laboratory procedures were too expensive. The CORE test was, nevertheless, recommended to the blood industry to be used as a surrogate test for AIDS in January 1983, at a cost of $2.50 per unit, with a success

---

4. We note that Kramer's affidavit here details events that occurred *after* the Hospital gave Jaime the transfusion in this case.

rate of identifying persons with AIDS at approximately 88 per cent. Based on all these facts, it was Kramer's opinion that:

Not only did the Gulf Coast Regional Blood Center and St. Joseph's Hospital fail to screen out donors who were at high risk for the transmission of transfusion associated viral diseases in their donor population, they also failed to implement surrogate tests for nonA/nonB Hepatitis, as well as the mandatory CORE antibody test to the Hepatitis B virus to ascertain whether the donor had a "history" of Hepatitis, as required by the Code of Federal Regulations. These tests were available in the mid and late 1970's and if implemented, would have been surrogate tests for the AIDS virus.

Comparing the affidavits, appellee's uncontroverted evidence demonstrates that, in December of 1982, no organization in the country recommended screening blood to prevent infection with AIDS. Appellant does not identify any organization, government entity, medical association, or person, in December of 1982, that required or specifically suggested surrogate testing as a means of screening blood for AIDS. Appellant has identified no hospital that conducted such tests on purchased blood in December of 1982. Instead, appellant offers the testimony of an expert whose current opinion, based on knowledge unknown in December of 1982, is that the Hospital should have used the surrogate tests to screen for AIDS. The Hospital argues that such a speculative, conclusive opinion, formulated on hindsight, cannot defeat its competent summary judgment evidence. For support, the Hospital again relies on *Gibson*, 822 S.W.2d at 100.

In *Gibson*, this Court evaluated the affidavit testimony of the same expert, Dr. Kramer, on the same issue, the surrogate testing of blood for AIDS. 822 S.W.2d at 100. This Court concluded that Dr. Kramer failed to set out the standard of care for a hospital regarding blood transfusions given to patients in March of 1983. *Id.* Moreover, the defendant there presented uncontroverted evidence that at that time, no pharmaceutical company, blood bank, hospital, or federal health care regulator in the

U.S. took special AIDS-related measures in connection with transfusions. *Id.* Further, the plaintiff did not identify any organization, government entity, or medical association that required or even advocated surrogate testing as a means of screening donated blood for AIDS in 1983. *Id.* As such, opposite the defendant's legally sufficient summary judgment evidence, Dr. Kramer's speculative and conclusory statements were inadequate to raise a fact issue concerning the standard of care. *Id.*

Here, as in *Gibson*, Dr. Kramer failed to state that the standard of care for hospitals in December of 1982 required surrogate AIDS tests on blood. Appellant argues, however, that evidence of compliance with community custom or minimum regulatory standards does not conclusively establish the standard of care, and Dr. Kramer contends the entire hospital industry failed to exercise ordinary care. When an entire industry has been negligent, courts have compelled an entire industry to upgrade its standard of care. *See, e.g., The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.1932) (Learned Hand, J.) (requiring all tugboats to be equipped with radios although none were so equipped at the time). Thus, appellant contends, even though no hospitals were using these tests in December of 1982, a fact question exists as to whether hospitals *should* have been using the surrogate tests to screen for AIDS. For support, appellant relies on *Longoria v. McAllen Methodist Hospital*, 771 S.W.2d 663 (Tex.App.—Corpus Christi 1989, writ denied), and *Hernandez v. Nueces County Medical Society Community Blood Bank*, 779 S.W.2d 867 (Tex.App.—Corpus Christi 1989, no writ). We consider both cases to be distinguishable.

*Longoria* involved a blood transfusion given to a child in 1982. 779 S.W.2d at 101. She contracted AIDS from the transfusion and later died. The plaintiffs sued the hospital and blood bank, and alleged both failed to use the best available procedure to test the blood for AIDS, and both failed to screen out high risk donors. The plaintiffs presented the expert testimony of the same Dr. Kramer, who said both the blood bank

and the hospital had a duty to test for AIDS. The trial judge granted the defendants' summary judgment, based on experts' affidavits showing that testing blood donations for AIDS was not done in 1982. On appeal, the summary judgment was reversed, because Kramer's affidavit raised a fact issue of whether the hospital or blood bank *should* have screened the donors or the blood for other diseases, and whether such screening would have prevented the child's death. 771 S.W.2d at 665.

*Longoria* differs from this case. In *Longoria*, the patient contracted both AIDS and cytomegalovirus (CMV) from the transfusion. The appeal, however, was limited solely to the question of whether the hospital and blood bank should have screened for CMV, not for AIDS. Evidence showed that prior to 1982, studies showed that many blood recipients contracted CMV from transfused blood. 771 S.W.2d at 664–65. No such evidence was presented in *Longoria* about AIDS. Moreover, in *Longoria*, serologic testing was available to detect CMV, but the blood bank and the hospital did not test. *Id.* Here, on the other hand, no serologic testing was available to detect AIDS on December 11, 1982. Thus, while Dr. Kramer's affidavit raised fact issues in *Longoria*, it failed to do so here. *See Gibson,* 822 S.W.2d at 102 ("We do not interpret *Longoria* to mean that 'surrogate' testing should have been performed to detect AIDS in February of 1983 . . . .").

In *Hernandez*, the plaintiff contracted non-A/non-B Hepatitis from a blood transfusion in June of 1986. 779 S.W.2d at 868. She sued the blood bank for negligence in failing to conduct surrogate tests, the ALT and CORE tests, for hepatitis. The blood bank alleged it had performed all tests required and recommended by FDA or the American Association of Blood Banks (AABB). *Id.* The trial judge granted the summary judgment.

On appeal, the court found the evidence showed that the blood bank had unduly lagged in the adoption of the screening procedures. 779 S.W.2d at 871. The evidence established that: (1) other blood banks used the surrogate tests to screen for hepatitis before the plaintiff's transfusion and before the AABB mandate; (2) the medical community found the surrogate tests useful in controlling the type of hepatitis plaintiff had contracted; (3) three months before the transfusion, the blood bank knew that the AABB would soon change its standards to require the surrogate tests to screen for hepatitis; (4) shortly after the plaintiff's transfusion, the AABB recommended the surrogate tests; (5) the defendant blood bank itself had used the ALT test to screen for hepatitis three years before Hernandez's transfusion. 779 S.W.2d at 872. Thus, that evidence created a fact issue as to whether the mere compliance with federal regulations had been sufficient. *Id.*

*Hernandez*, too, differs from this case. Here, appellants presented no evidence of any *hospital* in the country in December of 1982 that utilized the ALT and CORE tests even to screen out hepatitis, the disease they were designed to find, much less AIDS. While appellant presented evidence that three *blood banks* used the ALT and CORE tests, they used those tests to screen for hepatitis, not for AIDS. Moreover, Dr. Kramer's affidavit fails to show that at any time before Jaime's transfusion anybody even *recommended* the ALT and CORE tests be utilized as surrogate tests to screen blood for AIDS. Instead, appellant argues that given what science *now* knows about AIDS, we can say that *if* hospitals had only employed the hepatitis tests in December of 1982, they would have screened out up to 88 percent of the AIDS tainted blood, albeit through serendipity.

Clearly, the evidence here does not equal the evidence in *Hernandez*. There, the evidence showed a blood bank lagged by refusing to use a test designed to screen hepatitis, and as a result, a woman contracted hepatitis. Here, appellant presented no evidence to suggest St. Joseph Hospital lagged behind other hospitals, or that, as a whole, the industry was negligent by not utilizing the hepatitis tests to screen for AIDS. Appellant offers only the personal opinion of one expert, based on hindsight, that he thought the standards should

have been different and he would have liked to see the test performed. Such speculative and conclusory testimony is inadequate to defeat the Hospital's competent summary judgment evidence. *Gibson*, 822 S.W.2d at 100; *see also, e.g., Hines v. St. Joseph's Hosp.*, 86 N.M. 763, 766, 527 P.2d 1075, 1078 (App.), *cert. denied*, 87 N.M. 111, 529 P.2d 1232 (1974); *Hutchins v. Blood Serv. of Montana*, 161 Mont. 359, 506 P.2d 449, 452 (1973) (holding that a plaintiff in tainted blood case must do more than have an expert witness testify that he would have liked to have the test used). Because the Hospital conclusively demonstrated that in December of 1982, it had no duty to perform the surrogate hepatitis tests in order to screen for AIDS, the summary judgment was proper.

We overrule the pertinent portions of points of error one, two, five, and six.

The judgment is affirmed.